IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA SOBOTKA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 6728 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| A.C. CUNNINGHAM, PUBLIC DEFENDER | ) | |
| OF COOK COUNTY, in his official capacity; and | ) | |
| COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Sobotka ("Sobotka") has filed a one-count complaint against A.C. Cunningham, Public Defender of Cook County, in his official capacity, and Cook County, Illinois, alleging that defendants discriminated against her on the basis of gender in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206 *et seq*. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, defendants' motion is granted.

## FACTUAL BACKGROUND

In considering a motion for summary judgment, the court draws "all reasonable inferences from undisputed facts in favor of the nonmoving party and [views] the disputed evidence in the light most favorable to the nonmoving party." Harney v. Speedway SuperAmerica, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). The following facts are taken from Sobotka's complaint and from the parties' statements of facts as to which there is no material dispute.

**Linda Sobotka**

Linda Sobotka is a female employee of the Public Defender's Office. She holds an associates degree, a bachelors degree in sociology, and a business skills certificate. Since May 1990, she has been employed as a mitigation specialist and sentencing advocate under the job title of Administrative Assistant III with the office of the Public Defender of Cook County (the "Public Defender's Office" or the "Office"). The position of Administrative Assistant III is a salary grade 16, and Sobotka's current salary is approximately $54,737.00 per year.

In January 1996, the Public Defender disbanded the Office's Sentencing Advocacy unit. As a result, Sobotka was reassigned to the Multiple Defendant Division (the "MDD").[1] Among other responsibilities, mitigation specialists and sentencing advocates obtain background information and records from and about criminal defendants that can be used by the defendants' attorneys to assist in representation of the individuals and may impact the outcome of the cases on the merits and in sentencing. From 2005 through 2009, approximately 90 percent of Sobotka's work involved practice and approximately 10 percent involved policy issues. Her position is not defined by the Public Defender's Office as supervisory.[2]

From 2001 through 2007, in addition to her duties with the MDD, Sobotka attended lunch group meetings in which outside mitigation practitioners working for the Public Defender's Office discussed various issues. Sobotka would take messages back to the capital case coordinator and to the Public Defender who, once informed about the meetings, advocated for Sobotka's continued attendance. Additionally, Sobotka was authorized to speak on behalf of the Public Defender's Office about the "One Team One Voice" concept and the Office's

---

[1] At the request of supervisors in the Bridgeview office, in addition to her work with the MDD, Sobotka has worked on one murder case and one capital case.

[2] Because Sobotka fails to cite to anything in the record to substantiate her opposition to this assertion the court will treat this fact as admitted.

commitment to securing compensation for outside mitigation specialists. One Team One Voice was a two-day training held in July 2006 sponsored by the Office for investigators, attorneys, and mitigation specialists. Sobotka served on the planning committee for the training.

In addition, Sobotka has supervised interns and participated in trainings as part of her job duties. Since 2004 Sobotka has supervised four or five interns. She is not, however, involved in setting up internship programs for the Public Defender's Office. Since 2006, Sobotka has participated in 1 to 2 new employee trainings for attorneys in which she delivered a one-hour workshop on interviewing clients, identifying necessary records, and finding records. In 2009, Sobotka participated in an office mitigation training in which she discussed social history investigation and creating a mitigation case. In 2005, she was on the planning committee for the National Alliance for Sentencing Advocates and Mitigation Specialists' ("NASAMS") annual two-day Death Penalty Mitigation Institute Conference which was co-sponsored by the Public Defender's Office.

Sobotka has also attended trainings on mitigation, investigation, and computers. She is the staff person responsible for scanning documents, creating disks, and saving scanned documents on a shared drive of the attorneys in the MDD unit.

**Alvin Hill**[3]

Alvin Hill ("Hill") is a male employee of the Public Defender's Office. He holds an associates degree and a bachelors degree in sociology. He also has a masters degree in sociology and has completed all of the course work required for Ph.D.s in both sociology and criminology.

From 1990 through 1996, Hill supervised the mitigation specialists and sentencing advocates in the Public Defender's Office, including Sobotka. Hill has been employed with the Public Defender's Office as an Administrative Assistant V since December 18, 1989, when he was hired as Coordinator of the Sentencing Advocacy Team and charged with establishing a new sentencing advocacy program. The position of Administrative Assistance V is a salary grade 20, and Hill's current annual salary is $75,452.00.

When the Sentencing Advocacy unit was disbanded in 1996, Hill was assigned to the Murder Task Force (the "MTF") and no longer supervised the sentencing advocates. The MTF unit is a premiere unit within the Public Defender's Office that consists of the highest level attorneys who work strictly on murder cases, most of which are capital cases. He also periodically works on cases for felony trial court attorneys and has worked on four to five special cases outside of his regular assignments.

From 2005 to 2008, Hill spent approximately 75 percent of this time working on policy issues and approximately 25 percent of this time performing on his mitigation caseload with the MTF unit. From 1996 to 2009, Hill had an average caseload of 10. He is currently working on 14 cases, spending between two and 96 hours per month on each case. He typically works about 48 hours a week, just over half of which is spent in the office and the remainder in the field.

---

[3]Sobotka admits that her knowledge of Hill's duties is based on his former duties with the Public Defender's Office and that she has no knowledge of the work Hill currently performs aside from this duties as a sentencing and mitigation specialist with the MTF unit.

In addition to his mitigation caseload and policy role, Hill has had numerous other duties. From 2003 to 2009, at the request of the Public Defender, Hill attended management meetings three to six times a year with supervisors in the office. In addition, Hill is authorized to speak on behalf of the Public Defender on policy matters including: the nature of the Public Defender's Office's representation of their clients; how the community is involved; building social capital in communities to aid in the representation of clients; the importance of bringing social work to bear on behalf of clients; and the Public Defender's Office's opposition to the death penalty. From 1996 through 2009, Hill supervised six interns who worked for the Public Defender's Office for academic credit.

As part of his policy role, Hill works with the capital case coordinator in assessing the quality of outside mitigation specialists hired by the Office, advising attorneys on what to expect from such specialists, and redirecting those specialists who are not doing the appropriate work. Between 1996 and 2006, as many as one thousand such specialists may have been hired.

Hill is also regularly requested by his supervisors to research and prepare documents on certain issues that could potentially impact their clients, including legislative issues, night drug courts, truth in sentencing, speedy drug courts, and video conferencing. His writings have been combined with the work of head administrators as the official position of the Public Defender's Office.

Hill's policy role includes consultation with the Public Defender and other staff as to the Office's position on the death penalty, the Office's approach to death penalty practice, and the use of mitigation specialists in capital cases. He has also advised bar associations and universities about what is necessary for death penalty practice and lawyer training. In addition, Hill has participated in panels and spoken at law schools in an attempt to establish mitigation

specialty as an area of expertise necessary for effective assistance of counsel. His policy role also includes testifying before the state legislature and speaking at professional conferences and seminars on behalf of the Public Defender's Office.

Hill also serves as a liaison with community and educational groups. As part of these duties, Hill receives quarterly directives from the Public Defender to conduct presentations and attend meetings with community members both inside and outside the office, he participates in weekend community-based meetings convened by a social service organization regarding conditions of confinement, sentencing, and educational and vocational training in the Illinois Department of Corrections, and he maintains ongoing relationships with individuals and groups capable of providing services to clients and their families. Hill has also represented the Public Defender's Office on various panel discussions at educational institutions, including Loyola University and the University of Chicago. In 2007, Hill was asked by the Public Defender to co-teach a class with him at Chicago State University to train and secure interns for the Public Defender's Office for sentencing advocacy and mitigation.

Hill also works with victims' organizations, and as part of a victim outreach initiative he has counseled members of the Public Defender's Office to respect victims and change of the overall approach toward victims by informing them about the defense function of the Office.

Finally, Hill has participated in professional development for attorneys and served on interview panels to screen candidates for attorney positions. He has administered ten to twelve in-house training programs on behalf of the Public Defender's Office.

**DISCUSSION**

I. **Legal Standard**

Defendant has filed its motion for summary judgment under Fed. R. Civ. P. 56. Summary judgment is appropriate if the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Village Church v. Village of Long Grove, 468 F.3d 975, 988 (7th Cir. 2006). The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits that demonstrate an absence of material fact. See Celotex, 477 U.S. at 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). When reviewing a summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994).

II. **Equal Pay Act**

Sobotka alleges that defendants violated the EPA by paying her less than Hill was paid for substantially the same job duties. 29 U.S.C. § 206(d)(1), provides:

> no employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to . . . a seniority system; . . . a merit system; . . . a system which measures earnings

  by quantity or quality of production; or . . . a differential based on any other factor other than sex.

  To demonstrate a prima facie violation of the EPA, a plaintiff must show that: (1) different wages are paid to employees of the opposite sex; (2) the employees do equal work which requires equal skill, effort, and responsibility; and (3) the employees have similar working conditions. Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974). No intent is needed to prove discrimination under the EPA. Id. at 1213. The EPA imposes a form of strict liability on the employer. Id. Sobotka alleges that she was paid significantly less than Hill even though she performs the same, or substantially the same, job duties as Hill, and that this disparity in pay is not based on seniority, merit, or any other non-discriminatory reason. Defendants argue in response that the undisputed facts show that the pay differential between Sobotka and Hill is based on different duties and responsibilities performed by each, and that gender is not a factor.

  In the instant case, the parties do not dispute that Sobotka can establish the first and third elements of a prima facie case. At issue is whether Sobotka can establish that she and Hill do equal work that requires equal skill, effort, and responsibility. See 29 U.S.C. § 206(d)(1). Each of these elements must be met separately to establish a prima facie EPA claim. Cullen v. Ind. Univ. Bd. of Trs., 338 F.3d 693, 699 (7th Cir. 2003). To do this, Sobotka must show "that the jobs compared are substantially equal, based upon actual job performance and content – not job titles, classifications or descriptions." Markel v. Bd. of Regents of the Univ. of Wis. Sys., 276 F.3d 906, 913 (7th Cir. 2002) (citations omitted). The crucial inquiry is "whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." Fallon v. State of Illinois, 882 F.2d 1206, 1209 (7th Cir. 1989). If a common core is

established, the issue becomes whether any additional tasks make the positions "substantially different." Id.

Sobotka argues that following the break-up of the mitigation unit within the Public Defender's Office, Hill and her jobs shared a common core of tasks. Specifically, she argues that both she and Hill perform mitigation work and sentencing advocacy, both carry a typical caseload of approximately ten to fourteen cases, both perform mitigation work in cases where their clients are facing the possibility of the death penalty, both give presentations at professional conferences on mitigation and sentencing advocacy, both work on policy issues for the Office, and both are authorized to speak on behalf of the Office on specific issues. Sobotka further argues that she and Hill have substantially similar professional experience because they were hired within months of one another, they have attended and participated in professional development, conferences, and seminars, neither supervise employees, but both supervise and train interns. Finally, Sobotka argues that whether her work and Hill's work require the same level of effort and/or responsibility is a question of facts for the jury to decide.

Sobotka's arguments fail because they are grounded in a superficial analysis of the record in this case. The undisputed facts demonstrate that Sobotka and Hill did not do equal work requiring equal skill, effort, and responsibility. The first inquiry whether the positions required the same level of skill. "Skill includes consideration of such factors as experience, training, education, and ability." Cullen, 338 F.3d at 699 (quoting 29 C.F.R. § 1620.15(a)). To begin, Hill's educational background is far more extensive than Sobotka's. While they both have associates and bachelor's degrees, Hill also has a masters degree and has completed the course work towards two Ph.D.s. In addition, although both Sobotka and Hill were hired by the Office at approximately the same time, for the first six years of their tenure Hill helped to create the

mitigation unit and then supervised Sobotka and the rest of the mitigation unit employees. Sobotka has offered nothing to show how her position was comparable to Hill's for the first six years. Similarly, with respect to the years after the mitigation unit was disbanded, Sobotka has offered no evidence to show that her position required the same level of experience, training, or ability as Hill's. The undisputed facts show that while Sobotka and Hill may have engaged in a limited number of similar work tasks, defendants have demonstrated that Hill's position requires more training and skill by virtue of his assignment to the elite MTF unit and the broad scope of his official policy responsibilities at the Public Defender's Office.

The court next considers whether the two positions require equal amounts of responsibility. While both Sobotka and Hill's positions share some similar job tasks, Sobotka does not dispute that: Hill spends 75 percent of his time on policy issues, whereas Sobotka spends only 10 percent of her time on policy work; Hill, unlike Sobotka, is assigned to an elite unit of the Office responsible for murder (mostly capital) cases; Hill helped to create the mitigation unit and supervise its employees before the unit was disbanded;[4] Sobotka, unlike Hill, has never supervised any employee or participated in any attorney interview panels within the Public Defender's Office; in the last three years, Sobotka, unlike Hill, has not participated in any community outreach projects or participated in the formulation of administrative policy issues on behalf of the office; and in the last four years Sobotka, unlike Hill, has not worked on any

---

[4]The Office continues to regard Hill's position as supervisory even though he has not supervised employees since 1996. According to Edwin Burnette, the Cook County Public Defender during the majority of the relevant time period, supervisors perform their underlying roles, but their primary function is responsibility for developing and implementing the policy of the Public Defender. Sobotka denies that Hill has any supervisory duties and insists that Hill cannot be called a supervisor if he does not supervise employees. She has offered no evidence to support her assertion.

legislative issues or any noncriminal cases in conjunction with her work for the Public Defender's Office.

Sobotka's work outside her caseload has been limited to attending and reporting back from lunch meetings of mitigation specialists, supervising 4 to 5 interns, contributing to the planning of two two-day conferences, participating in a handful of training, and archiving digital documents for the Multiple Defendant Division unit. Some of these activities, although sanctioned by the Office, were conducted voluntarily, outside of the official work duties required for her position. In contrast, the record shows that Hill has given numerous presentations at conferences, trainings, community meetings, educational institutions, and legislative sessions as part of his official policy responsibilities. He has also authored and co-authored numerous policy papers on behalf of the Office. Finally, Hill has been authorized to speak on behalf of the Public Defender on dozens of issues, whereas Sobotka has authorization to speak on only two discrete issues. The record shows that the positions do not have equal levels of responsibility.

The final inquiry is whether the level of effort required by the two positions is equal. The record shows that Hill's position regularly requires him to spend a significant amount of time after normal business hours, during week nights and weekends, to fulfill his official policy duties doing community outreach, working with social service and victim organizations, attending conferences and speaking on panels, and preparing official policy documents. Sobotka, in contrast, can claim only that in the relevant time period she regularly attended lunchtime meetings, participated in the planning of two larger trainings/conferences, and participated in a handful of trainings. Much of this work was done on a voluntary basis, and although sanctioned by the Public Defender, was not a part of her official duties with the Office. Upon this record, Sobotka has not shown that her position requires equal effort to that of Hill's.

The court concludes that the record, read in its totality, establishes that Sobotka and Hill's positions do not require equal levels of skill, effort, or responsibility such that they constitute equal work. Consequently, Sobotka has failed to establish a prima facie case under the EPA, and defendants' motion for summary judgment is granted.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted.

**ENTER:** July 13, 2010

_____
**Robert W. Gettleman**
**United States District Judge**